# IN THE SUPREME COURT OF THE STATE OF DELAWARE

<table>
<tr><td>

OPTINOSE AS and<br>
OPTINOSE, INC.,<br><br>

    Defendants Below,<br>
    Appellants,<br><br>

    v.<br><br>

CURRAX PHARMACEUTICALS,<br>
LLC,<br><br>

    Plaintiff Below,<br>
    Appellee.

</td><td>

§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§

</td><td>

No. 48, 2021<br><br>

Court Below: Court of Chancery<br>
of the State of Delaware<br><br>

C.A. No. 2020-0122

</td></tr>
</table>

Submitted: September 29, 2021
Decided: November 2, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Court of Chancery: **AFFIRMED IN PART**, **REVERSED IN PART**.

Joseph B. Warden, Esquire (*argued*) and Douglas E. McCann, Esquire, FISH & RICHARDSON P.C., Wilmington, Delaware, *for Defendants Below, Appellants OptiNose AS and OptiNose, Inc.*

Daniel A. O'Brien, Esquire, VENABLE LLP, Wilmington, Delaware, Christopher P. Borello, Esquire (*argued*) and Joshua D. Calabro, Esquire, VENABLE LLP, New York, New York, *for Plaintiff Below, Appellee Currax Pharmaceuticals LLC.*

**SEITZ**, Chief Justice:

OptiNose and Currax are pharmaceutical companies. OptiNose agreed to license its Exhalation Delivery Systems ("EDS") technology to Currax. The EDS devices administer powder and liquid drugs through the nose. The parties limited the License Agreement to a product which uses a powder EDS device to deliver the migraine treatment drug sumatriptan into the nasal cavity. The product covered by the license—a powder EDS device and sumatriptan together—is trade-named ONZETRA® XSAIL®.

At the risk of oversimplifying a complex License Agreement, Currax has a limited right to sell the sumatriptan powder EDS device (the "Product") in Canada, the United States, and Mexico. OptiNose retained the right to sell EDS devices (1) with powders and liquids other than sumatriptan around the world, and (2) EDS devices with sumatriptan in every area other than those three countries. OptiNose also gave Currax the "first right" to "prosecute and maintain" certain patents related to the Product, listed in the License Agreement as the Product Patents. But if Currax's filings or statements "relate to or characterize the Device component of the Product or other OptiNose intellectual property," OptiNose has a right to approve patent filings and statements, an approval not to be unreasonably withheld.

During Currax's prosecution of the '009 Patent Application— which covers only a powder EDS device and is listed as a Product Patent in the License

Agreement—the U.S. Patent and Trademark Office ("USPTO") rejected claims because they were not "patentably distinct" from the claims in another Product Patent. To overcome the patent office rejection, Currax needed to file a terminal disclaimer over the issued Product Patent.

A terminal disclaimer essentially concedes part of a patent's monopoly protection. In other words, the patent owner agrees that the claims in the patent application will not extend beyond the term of the parent patent. As such, the terminal disclaimer must be filed by the owner of both patents or someone with power of attorney for the owner. Even though Currax had the first right to prosecute the '009 Application, OptiNose was the owner of the '009 Application and the issued patent. Thus, Currax needed a power of attorney from OptiNose to file a terminal disclaimer. OptiNose refused to provide it.

Currax filed suit against OptiNose in the Court of Chancery, seeking an order of specific performance requiring OptiNose to grant it a power of attorney. OptiNose counterclaimed for a declaration that the License Agreement did not require it to provide a power of attorney. According to OptiNose, Currax's right to prosecute Product Patents did not include a power of attorney, and, in any event, Currax could not file a terminal disclaimer without OptiNose's advance approval, which it had not given.

3

The Court of Chancery granted Currax's motion for judgment on the pleadings. According to the court, the plain language of the License Agreement required OptiNose to provide a power of attorney to prosecute the '009 Application. The court also held that OptiNose did not have an advance approval right for a terminal disclaimer that does not refer to the tangible EDS Device. The approval right covered statements made about the tangible EDS Device, and not statements relating to intellectual property incorporated in the EDS Device.

On appeal, the dispute has morphed into highly technical arguments going beyond the allegations in the complaint and counterclaims. Although they raise other arguments, the parties have focused primarily on OptiNose's advance approval right, and whether a terminal disclaimer "relate[s] to or characterize[s] the Device component of the Patent or other OptiNose intellectual property."

We affirm the Court of Chancery's judgment that filing a terminal disclaimer in the '009 Application prosecution is included in the rights OptiNose gave to Currax under the License Agreement. Currax has the first right to prosecute Product Patents under the License Agreement, which includes filing terminal disclaimers. But the Court of Chancery erred when it took too narrow a view of what it means to "relate[] to or characterize[]" the tangible EDS Device used to administer sumatriptan. A terminal disclaimer relates to or characterizes the tangible EDS Device because it

4

relates to and characterizes the intellectual property incorporated in the tangible EDS Device. Thus, we reverse that part of the Court of Chancery's decision.

## I.

OptiNose AS and OptiNose, Inc. ("OptiNose") create and develop pharmaceutical products.[1] OptiNose developed the Bi-Directional™ Exhalation Delivery Systems ("EDS") technology, which can deliver substances into the nasal cavity more deeply than conventional nose sprays.[2] There are two types of devices that use the EDS technology, powder EDS devices and liquid EDS devices.[3] One device and drug combination is the product ONZETRA® XSAIL® (the "Product").[4] The Product combines a branded version of the generic migraine drug sumatriptan and a powder EDS device designed to deliver the sumatriptan deep into the nasal cavity.[5] OptiNose licensed the Product to Currax Pharmaceuticals LLC ("Currax"), which acquires and commercializes branded and generic prescription drugs.

---

[1] *Currax Pharm. LLC v. OptiNose AS*, 2021 WL 223810, at *2 (Del. Ch. Jan. 22, 2021) (hereinafter "Opinion" or "Op."). The facts are drawn from the pleadings, documents incorporated into and referred to in the pleadings, and the appendix on appeal.

[2] App. to the Opening Br. at A0130.

[3] OptiNose distinguishes between the types of device with its trademarks: the XHANCE® product uses a liquid EDS system and the XSAIL® product uses a powder EDS system. *See* App. to Opening Br. at A0130; A0098; A0113.

[4] Op. at *2; App. to the Opening Br. at A0028 (Complaint ¶15).

[5] *See* App. to the Opening Br. at A0083–A0084 (Royalty License Agreement § 1.22); *id.* at A0041 (Agreement § 1.01(a)).

The parties entered into a September 25, 2019 License Agreement.[6] The License Agreement gives Currax the right to make and sell the Product in Canada, the United States, and Mexico (the "Territory").[7] The License Agreement also lists certain patents and patent applications relevant to the agreement, defined as "the OptiNose Patents."[8] These patents are then divided into Platform Patents[9] and Product Patents.[10] The distinguishing feature between the Product Patents and the Platform Patents is apparently whether they cover only a powder EDS device or a powder EDS device and a liquid EDS device.[11]

Currax has "the first right to control the Prosecution and maintenance of the Product Patents in the Territory," a right subject to two caveats: (1) OptiNose has the right to review and comment on all filings to patent agencies such as the USPTO, and (2) "filings or statements in any filing relating to or characterizing the Device component of the Product or other OptiNose intellectual property shall require OptiNose's prior approval (such approval not to be unreasonably withheld,

---

[6] *Id.* at A0037 (Agreement cover page).

[7] *Id.* at A0038; A0041; A0044.

[8] *Id.* at A0076 (Agreement Schedule 1.01(b)). There is also a definition in the License Agreement of OptiNose Patents that goes beyond the listed patents. *Id.* at A0040 (Agreement § 1.18).

[9] *Id.* at A0077 (Agreement Schedule 1.01(c)); *id.* at A0041 (Agreement § 1.01(a)).

[10] *Id.* at A0078 (Agreement Schedule 1.01(d)); *id.* at A0041 (Agreement § 1.01(a)).

[11] Opening Br. at 12; *see also* App. to the Opening Br. at A0051 (Agreement § 5.01(a)(i)) ("If a Product Patent issues with claims that are listable for or Cover XHANCE® (fluticasone propionate), such Patent shall cease to be a Product Patent and shall thereafter be a Platform Patent.").

conditioned or delayed)."[12] The License Agreement also provides that "OptiNose shall cooperate in transferring the right to Prosecute and maintain the Product Patents to Currax, including but not limited to executing any forms required to effect such transfer."[13] OptiNose maintains "the sole right" to prosecute and maintain the Platform Patents.[14]

One of the Product Patents is not an issued patent but a patent application, U.S. Patent Application No. 15/879,009 (the "'009 Application").[15] The '009 Application is entitled "Powder Delivery Devices" and covers powder EDS devices without reference to the type of drug administered through the EDS device. Another is an issued patent—U.S. Patent No. 8,899,229 (the "'229 Patent"), also entitled "Powder Delivery Devices."[16] The claims in the '009 Application significantly overlap with the claims of the '229 Patent, its parent patent.[17]

During prosecution of the '009 Application, the USPTO issued a nonstatutory obviousness-type double patenting rejection.[18] There are two types of double patenting rejections. One is the "same invention" or "statutory" double patenting

---

[12] App. to the Opening Br. at A0051 (Agreement § 5.01(a)(i)).
[13] *Id.* at A0053 (Agreement § 5.01(c)(i)).
[14] *Id.* at A0051 (Agreement § 5.01(a)(ii)).
[15] *Id.* at A0078 (Agreement Schedule 1.01(d)); U.S. Patent Application No. 15/879,009 (filed Jan. 24, 2018).
[16] App. to the Opening Br. at A0078 (Agreement Schedule 1.01(d)); U.S. Patent No. 8,899,229 (filed Feb. 23, 2006).
[17] *See* App. to the Opening Br. at A0357–A0358.
[18] *Id.* at A0356; A0357.

rejection.[19]  A statutory double patenting rejection happens when two patents from the same owner have the same patent claim, or one that is substantially identical. The second is the "nonstatutory" double patenting rejection, which is intended primarily to prevent extension of the patent term by rejecting claims in a second patent not "patentably distinct" from claims in a first patent.[20]  In other words, the new invention is unpatentable as an obvious variation of the old one.  This doctrine ensures that a patentee's right to exclude others from making, using, or selling an invention is not extended beyond the time that would be fair—*i.e.*, the time allotted to the inventor from the original patent.[21]

To overcome an obviousness-type double patenting rejection, a patent applicant can file a "terminal disclaimer."[22]  A terminal disclaimer essentially surrenders part of a patent's term.  The owner agrees that the new patent will not last beyond the term of the parent patent, thereby "disclaiming" the ending "term" of the

---

[19] A statutory double patenting rejection is based on 35 U.S.C. § 101, which states in the singular that an inventor "may obtain a patent."  *See, e.g., In re Van Ornum*, 686 F.2d 937, 942 (C.C.P.A. 1982).

[20] *See* U.S. Patent and Trademark Office, Manual of Patent Examining Procedure § 804 (9th ed. Rev. Oct. 2019) ("MPEP"); Op. at *3.

[21] *Van Ornum*, 686 F.2d at 943–44; *see also In re Schneller,* 397 F.2d 350, 354 (C.C.P.A. 1968) ("if appellant were now to prevail, the end result would be the grant of another patent effectively extending the time during which he may exclude others from practicing an invention which is disclosed and claimed in his issued patent.").

[22] *E.g., Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 873 (Fed. Cir. 1991); s*ee generally* 37 C.F.R. § 1.321 (2021).

patent.[23] Filing a terminal disclaimer has other consequences. Terminal disclaimers can also be used in litigation by an accused infringer to attack parent patents, because a terminal disclaimer is "a strong clue" that the claims are not distinct from those of the parent patent and a concession on behalf of the patentee to that effect.[24] It can also be used to interpret the claims of a parent patent.[25]

As it is a "same invention" rejection, only the patent owner of both patents or someone with power of attorney for the owner can file a terminal disclaimer.[26] In response to the USPTO's double patenting rejection of the '009 Application, Currax requested that OptiNose, the patent owner, sign a power of attorney to enable Currax to file a terminal disclaimer.[27] OptiNose refused.[28] Currax filed a complaint in the Court of Chancery seeking specific performance of its first right to prosecute the Product Patents.[29] Currax argued that Section 5.01(c)(i) of the License Agreement gave Currax the right to prosecute the Product Patents listed in the agreement.

---

[23] It may also expire before the parent patent—as in this case, when the '229 Patent received certain statutory adjustments that extend its monopoly term. The '009 Application patent would be confined to the '229 Patent's term without adjustment, meaning that it would potentially expire years before the '229 Patent. Opening Br. at 32–33 n.4.

[24] *E.g., SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1168 (Fed. Cir. 2018) ("a terminal disclaimer is a strong clue that a patent examiner and, by concession, the applicant, thought the claims in the continuation lacked a patentable distinction over the parent").

[25] *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("A statement made during prosecution of related patents may be properly considered in construing a term common to those patents . . . .").

[26] *Japanese Found. for Cancer Research v. Lee*, 773 F.3d 1300, 1309 (Fed. Cir. 2014).

[27] Op. at *3.

[28] *Id.*

[29] App. to Opening Br. at A0023–34.

Currax also contended the "first right to prosecute" included receiving a power of attorney from OptiNose, because it was necessary to file a terminal disclaimer.

In its answer and counterclaim, OptiNose sought a declaratory judgment "that the [License] Agreement does not obligate OptiNose to grant Power of Attorney for Currax to control Prosecution . . . ."[30] OptiNose also claimed that it had an approval right before Currax could file a terminal disclaimer.[31]

The Court of Chancery granted Currax's motion for judgment on the pleadings. First, the court held that Currax's "'prosecution' powers [under the License Agreement] permit it to file terminal disclaimers, and that by agreeing to cooperate in transferring prosecution rights to [Currax], [OptiNose] agreed to execute the power of attorney required for [Currax] to implement those rights."[32] The court also found that OptiNose's approval right was limited to, in the words of the License Agreement, "filings or statements in any filing relating to or characterizing the Device component of the Product or other OptiNose Intellectual Property."[33] Even though the definition of Device refers to OptiNose intellectual property incorporated into the Device, the Court of Chancery held that "Device component of the Product" was limited to the tangible object to be manufactured and

---

[30] *Id.* at A0108.
[31] *Id.* at A0109.
[32] Op. at *1.
[33] *Id.* at *9; App. to the Opening Br. at A0051 (Agreement § 5.01(a)(i)).

not the intellectual property incorporated in the tangible EDS Device.[34]  Thus, statements made to the USPTO that were only about intellectual property, such as the terminal disclaimer, did not trigger the approval right.[35]  The court also read filings relating to or characterizing "other OptiNose intellectual property" to mean "OptiNose intellectual property other than the Product Patents."[36]  As such, the court held that OptiNose's approval right was not triggered by filing the terminal disclaimer.[37]

We review *de novo* the Court of Chancery's judgment granting Currax's motion for judgment on the pleadings.[38]

## II.

### A.

OptiNose claims that the Court of Chancery erred when it ordered OptiNose to provide a power of attorney to allow Currax to file a terminal disclaimer while prosecuting the '009 Application.  According to OptiNose, the License Agreement does not specify how OptiNose must facilitate Currax's prosecution rights.  Instead, the agreement is clear that the only rights granted are those that are expressly set

---

[34] Op. at *8.
[35] *Id.*
[36] *Id.* at *8–9.
[37] *Id.* at *9.
[38] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1204 (Del. 1993) ("our review of the trial court's grant of a motion for judgment on the pleadings presents a question of law, which we review de novo.").

11

forth in the License Agreement and a requirement to provide a power of attorney should not be implied.

We agree with the Court of Chancery, however, that the License Agreement required OptiNose, in principle, to provide a power of attorney. Under the License Agreement, Currax has "the first right to control the Prosecution and maintenance of the Product Patents in the Territory."[39] OptiNose must "cooperate in transferring the right to Prosecute and maintain the Product Patents to Currax, including executing any forms required to effect such transfer."[40] In the agreement, "prosecution" includes "any ex parte proceeding or practice before an administrative agency such as the United States Patent and Trademark Office."[41] Terminal disclaimers are filed during ex parte patent prosecutions.[42] As such, the right to "prosecute" includes filing terminal disclaimers. And only the owner or "the attorney of record with power of attorney" for both patents can file a terminal disclaimer.[43] Therefore, if Currax needs to file a terminal disclaimer in prosecuting

---

[39] App. to the Opening Br. at A0051 (Agreement § 5.01(a)(i)).
[40] *Id.* at A0053 (Agreement § 5.01(c)(i)).
[41] *Id.* at A0041 (Agreement § 1.01(a)).
[42] Op. at *6. The definition of prosecution does not include "post-grant reviews, inter partes reviews or oppositions." App. to the Opening Br. at A0041 (Agreement § 1.01(a)). These procedures take place after the issuance of a patent—further confirming that the parties intended to cover all filings that take place during prosecution.
[43] Op. at *6 (first quoting 37 C.F.R. § 1.321(b)(1) (2021); then quoting *Japanese Found. for Cancer Research*, 773 F.3d at 1309).

12

the Product Patents, OptiNose must, subject to other limitations in the License Agreement, provide a power of attorney to file a terminal disclaimer.

OptiNose also argues that a terminal disclaimer abandons a patent because the disclaimer effectively abandons part of its term. The License Agreement provides that "[i]f Currax determines to abandon or not maintain any Product Patent," it will inform OptiNose and "OptiNose shall then have the right (but not the obligation) to Prosecute and maintain such Product Patent in OptiNose's name" and Currax's licenses as to that patent will be terminated.[44] Thus, according to OptiNose, the License Agreement allows OptiNose to assume control of the prosecution if Currax chooses to file a terminal disclaimer.

The Court of Chancery properly recognized, however, that abandonment under the License Agreement is directed to "unilateral abandonment of a Product Patent."[45] By contrast, a terminal disclaimer "allows the patent application to continue, rather than changing the patent's scope or abandoning the application."[46] And abandonment is a term of art in patent law, set forth in the Code of Federal Regulations, which is not applicable in these circumstances.[47] If we accepted OptiNose's definition of abandonment, Currax would be "abandoning" the Product

---

[44] App. to the Opening Br. at A0051 (Agreement § 5.01(a)(i)).
[45] Op. at *7.
[46] Id.
[47] Id. (citing MPEP § 711; 37 C.F.R. §§ 1.135; 1.138 (2021)).

Patents every time it limited or gave up claims in any prosecution, an absurd result. Currax has not, therefore, abandoned the '009 Application or its claims.

## B.

We turn to the main issue in this appeal—whether Section 5.01(a)(i) requires OptiNose's approval before Currax can file a terminal disclaimer to overcome the rejection of the '009 Application in light of the '229 Patent. Section 5.01(a)(i) of the License Agreement provides as follows:

> Currax shall have the first right to control the Prosecution and maintenance of the Product Patents in the Territory; provided that Currax shall provide copies to OptiNose of all communications with the applicable patent offices reasonably in advance of filing and OptiNose shall have the right to review and comment on such filings, which Currax shall reasonably consider; provided, further, that filings or statements in any filing relating to or characterizing the Device component of the Product or other OptiNose intellectual property shall require OptiNose's prior approval (such approval not to be unreasonably withheld, conditioned or delayed).[48]

The Court of Chancery held that the "Device" was limited to the tangible EDS Device used to deliver a drug in the Product, and "[w]here, as here, a terminal disclaimer does not relate to or characterize a tangible component of the [Product], it does not relate to or characterize the 'Device component of the Product' and does not . . . trigger" OptiNose's approval right.[49]

---

[48] App. to the Opening Br. at A0051 (Agreement § 5.01(a)(i)).
[49] Op. at *8.

OptiNose argues that a terminal disclaimer cuts short the '009 Application patent term covering the "nosepiece assembly" component of the EDS Device and acts as a concession that the nosepiece assembly in the '009 Application is not patentably distinct from the nosepiece assembly in the '229 Patent.[50] Thus, a terminal disclaimer is a filing "relating to" and characterizing the Device component of the Product. And the Device component of the Product, OptiNose argues, includes the intellectual property covering the device. According to OptiNose, if patent filings like a terminal disclaimer do not relate to or characterize the intellectual property covering the tangible EDS Device, OptiNose would never have approval rights over any patent filings or statements because the tangible EDS Device has no role to play in patent prosecution proceedings.

Currax responds that the patent office statements must be confined to statements relating to the tangible EDS Device and not intellectual property covering the tangible EDS Device.[51] If not, Currax contends, the statements would apply to every Product Patent and render meaningless Currax's first right to control the prosecution of Product Patents.

We agree with the Court of Chancery that the parties intended the "Device component of the Product" to refer to the tangible EDS Device used to administer

---

[50] Opening Br. at 5–6.
[51] Answering Br. at 5.

15

sumatriptan. But we also find that the Court of Chancery gave too limited a reading to what it means for a patent office statement or filing, such as a terminal disclaimer, to "relate to or characterize" the tangible EDS Device. In our view, a terminal disclaimer relates to or characterizes the tangible EDS Device used to administer sumatriptan because it relates to and characterizes the intellectual property incorporated in the tangible EDS Device.

i.

First, the words "relating to," like the words "arising under" or "involving," signal an intent to interpret expansively the connection between patent office statements or filings, and the tangible EDS Device used to administer sumatriptan.[52] "Characterize" should be given its ordinary meaning, "[t]o describe the distinctive nature or features of."[53] Next, we look to the definitions the parties used in the License Agreement. "Device" means "a device or component thereof incorporating the OptiNose Patents or other intellectual property rights owned or Controlled by

---

[52] *Eon Labs Mfg., Inc. v. Reliance Ins. Co.*, 756 A.2d 889, 892 (Del. 2000) (affirming a Superior Court judgment that all the allegations against [the plaintiff] "'come within the scope of the *arising out of* language,' including 'claims **related to** the use of [plaintiff's drug] . . . .' The basis for this holding is that all claims are '**related to** the fact that Eon manufactured and distributed phentermine.'" (emphasis added) (citations omitted)); *see also Liggett Grp. Inc. v. Affiliated FM Ins. Co.*, 2001 WL 1456871, at *6 (Del. Super. Ct. Sept. 12, 2001), *aff'd sub nom. Liggett Grp., Inc. v. Ace Prop. & Cas. Ins. Co.*, 798 A.2d 1024 (Del. 2002) (holding that symptoms or consequences causally linked to smoking are "related to" smoking even if not directly caused by the act of smoking).

[53] *Characterize, v.*, Oxford English Dictionary Online, https://www.oed.com/view/Entry/30656 (last visited Oct. 27, 2021).

OptiNose."[54] The parties do not dispute that the "Device" referred to in Section 5.01(a)(i) refers to the tangible EDS Device that delivers the drug into the nasal cavity.[55] "OptiNose Patents" are those patents necessary to make and sell the Product.[56] Finally, the "Product" means "the pharmaceutical product known as ONZETRA® XSAIL® . . . ."[57]

## ii.

To "give sensible life to [the] contract," we look to the "overall scheme or plan" of the agreement and the "basic business relationship between [the] parties[.]"[58] Currax received a limited license in the Territory to sell the sumatriptan powder EDS device to treat migraines. OptiNose retained all other rights in the Product Patents around the world.[59] Notably, Currax had only a "first right" to prosecute the Product Patents—as compared to OptiNose's "sole right" to control

---

[54] App. to the Opening Br. at A0039 (Agreement § 1.01(a)).

[55] Answering Br. at 30–32; Reply Br. at 5–6; *see also* Transcript of Oral Argument at 17, ll. 5–12, *Currax Pharmaceuticals LLC v. OptiNose AS, et al.*, No. 2020-0122-MTZ (Del. Ch. Oct. 23, 2020) (OptiNose: "the specific terminal disclaimer . . . relates to a prior product patent that relates to, you know, aspects in the physical device . . . the specific terminal disclaimer would relate to either the physical device, because of the characterized aspect of it[.]").

[56] App. to the Opening Br. at A0039 (Agreement § 1.01(a)).

[57] *Id.*

[58] *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 927 (Del. 2017), *as revised* (June 28, 2017) ("The basic business relationship between parties must be understood to give sensible life to any contract."); *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) ("The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan." (citation omitted)).

[59] Opening Br. at 12; *see Chicago Bridge*, 166 A.3d at 928 (holding that interpretation of a provision is "informed by its function in the overall [agreement].").

the Platform Patents.[60]  If Currax made statements to the USPTO about OptiNose's core product—the EDS Device—it makes sense that it would require OptiNose's prior approval.  Otherwise, Currax might make statements about the powder EDS device that could have negative effects on OptiNose's worldwide patent portfolio covering EDS devices, or its use in the Territory with powders other than sumatriptan.

The Court of Chancery held that statements made to the patent office do not relate to or characterize the "Device" as a tangible component of the Product when they do not refer to something other than intellectual property covering the device. We disagree.  First, the License Agreement defines "Device" as "a device or component thereof incorporating the OptiNose Patents or other intellectual property rights owned or Controlled by OptiNose."[61]  By making the point that the tangible EDS Device incorporates the OptiNose Patents, the parties intended the intellectual property covering the tangible device to be included within the definition of Device.

Equally important, the court's interpretation effectively leaves OptiNose without an approval right.  The reference to the Device appears in the section directed to "Intellectual Property Matters" and "Patent Prosecution."[62]  Subsection

---

[60] *Compare* App. to the Opening Br. at A0051 (Agreement § 5.01(a)(i)) *with id.* (Agreement § 5.01(a)(ii)).

[61] *Id.* at A0039 (Agreement § 1.01(a)).

[62] *Id.* at A0051 (Agreement art. 5).

5.01(a) is titled "Prosecution of OptiNose Patents."[63] Filings relating to the Device are made during patent prosecution proceedings, like those occurring with the '009 Application. At oral argument Currax was hard-pressed to come up with an example of how a patent office filing would relate to just the tangible Device and not intellectual property covering the device.[64] That is probably because tangible devices do not have a role in patent prosecutions. The USPTO expressly discourages submission of physical models or extrinsic evidence with respect to a patent or application.[65] If, as the Court of Chancery held, patent office filings relating to or characterizing the Device Component of the Product are limited to the tangible EDS Device and not intellectual property covering the Device, OptiNose's prior approval right would be essentially meaningless in patent prosecution proceedings.[66]

When we include OptiNose's intellectual property rights with the tangible EDS Device, and give an expansive reading of a patent office filing that "relates to"

---

[63] *Id.* (Agreement § 5.01).

[64] Currax claimed that, in response to an obviousness type rejection, Currax could point to the commercial success of the physical Product which embodies the claims to overcome the rejection. Oral Argument at 24:00–24:30. But this supports the idea that the patent would be related to the Device component of the Product, if not fully characterizing the Product. And Currax's argument means that any approval right is extremely limited—covering only *one*, potentially unnecessary filing—and would render the provision essentially meaningless.

[65] 37 C.F.R. § 1.91 (2021); MPEP § 608.03; *cf.* 21 C.F.R. § 314.53 (2021) (requiring entities submitting pharmaceuticals to the Food and Drug Administration for approval to list "each patent claim[ing] the drug or a method of using the drug").

[66] *See Kuhn Constr., Inc. v. Diamond State Port Corp*, 990 A.2d 393, 396–97 (Del. 2010) (stating that Delaware courts "will give each provision and term effect, so as not to render any part of the contract mere surplusage." (citation omitted)); Restatement (Second) of Contracts § 202 cmt. a (1981) ("The meaning of words and other symbols commonly depends on their context.").

the Device, it is easy to conclude that the terminal disclaimer filed in the '009 Application relates to the intellectual property incorporated into the tangible EDS Device. The '009 Application, entitled "Powder Delivery Devices," is directed to the structure of the nosepiece assembly in a powder EDS device for use with any powder. The '229 Patent, similarly, is not restricted to sumatriptan or any powder. A terminal disclaimer filed in the '009 Application prosecution would concede that the '009 Application claims are not patentably distinct from the '229 Patent claims. The terminal disclaimer therefore characterizes the Device component of the Product by admitting that these two inventions, both implemented in the EDS Device, are largely the same.

A terminal disclaimer filed in the '009 Application could have real world implications for the tangible EDS Device in patent litigation. As an example, an accused infringer of the Device component of the Product could point to differences between their product and the Device component of the Product (which incorporates the '229 Patent) as evidence that their product did not infringe the '229 Patent.[67] The tangible EDS Device and the claims of the patents that it incorporates are inextricably linked in patent office proceedings—including when a party makes

---

[67] *E.g.*, *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 788 (Fed. Cir. 2019) (finding a comparison between a commercial product and an accused product can be used to "support a finding of infringement" "when a commercial product meets all the claim limitations" or embodies the claims. (quoting *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1289 (Fed. Cir. 2010))).

statements about the nature of the device through a terminal disclaimer that relates to an EDS Device patent.

Our interpretation does not "swallow" the License Agreement's separate provision restricting OptiNose's right to review and comment on "all communications with the applicable patent offices[.]"[68] There are Product Patents that do not relate directly to the tangible EDS Device—patents directed to "Sumatriptan Powder Delivery" and "Temperature/Moisture Regulation."[69] While there may be statements in these filings that relate to the Device, it is evident not all Product Patent statements or filings relate to the Device. As OptiNose concedes, if Product Patents, such as U.S. Patent No. 9,649,456, are directed to a powder EDS device delivering sumatriptan, these patents are directed to the Product, and not the Device component of the Product.[70] Filings or statements in those cases are unlikely to relate to or characterize a powder EDS device that does not contain sumatriptan, and OptiNose agrees that this is an area where Currax can prosecute "without OptiNose's approval."[71]

Indeed, in the original '009 Application, claim 16 states:

16. A capsule for containing a powdered substance which exhibits insufficient tackiness, and optionally no surface tackiness, in the presence of moisture so as not to adhere to an inner surface of a

---

[68] App. to the Opening Br. at A0051 (Agreement § 5.01(a)(i)).
[69] Id. at A0078 (Agreement Schedule 1.01(d)).
[70] Reply Br. at 3–5; U.S. Patent No. 9,649,456 (filed Apr. 7, 2008).
[71] Reply Br. at 4–5.

21

capsule chamber which contains the capsule during emptying of the capsule.[72]

This capsule is meant for use in the tangible EDS Device—but it is not a statement that relates to or characterizes the device itself. It is a delivery system for the powdered substance, a capsule that contains a predetermined dose. OptiNose would not have an approval right. In contrast, the '009 Application relates only to the Device component of the Product, and Currax wishes to file a terminal disclaimer that characterizes the '229 Patent and the '009 Application's claims covering the EDS Device. We do not see any inconsistency in giving OptiNose expansive rights to approve in advance filings relating to the intellectual property incorporated in the tangible EDS Device. It is consistent with how the parties allocated rights under the License Agreement.

## III.

We affirm the Court of Chancery's ruling that the License Agreement, in principle, can require OptiNose to provide a power of attorney. But we reverse the Court of Chancery's ruling that the terminal disclaimer "does not relate to or

---

[72] U.S. Patent Application No. 15/879,009 (filed Jan. 24, 2018), *available at* https://patents.google.com/patent/US20180272085A1/en?oq=15%2f879%2c009. The '009 Application is referenced numerous times in the pleadings and relied upon below, though not identified in the complaint. It is also incorporated by reference into the contract (at Schedule 1.01(d)) and as such, we may consider it here. App. to the Opening Br. at A0078; *Rag American Coal Co. v. AEI Resources, Inc.*, 1999 WL 1261376, at *9 (Del. Ch. Dec. 7, 1999) (holding that "a document incorporated by reference into the contract" is not "extrinsic evidence," and may be considered in deciding a motion for judgment on the pleadings).

characterize the 'Device component of the Product.'" [73]   Currax must obtain

OptiNose's approval, not to be unreasonably withheld, before filing the terminal

disclaimer in the '009 Application.

---

[73] Op. at *8.